IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-03445-PAB-NYW

MARTHA MURPHY,

      Plaintiff,

v.

PAGOSA LAKES PROPERTY OWNER'S ASSOCIATION, a Colorado not-for-profit
corporation,

      Defendant.

_____

## ORDER
_____

      This matter is before the Court on the Motion for Summary Judgment as to

Liability [Docket No. 20] filed by plaintiff Martha Murphy and the Motion for Summary

Judgment [Docket No. 21] filed by defendant Pagosa Lakes Property Owner's

Association ("PLPOA"). This Court has subject matter jurisdiction pursuant to 28 U.S.C.

§ 1331.

## I. BACKGROUND[1]

      PLPOA is a homeowners association located in Pagosa Springs, Colorado.

PLPOA is governed by a board of directors (the "board"). On June 25, 2010, plaintiff

began working for PLPOA in the Department of Community Standards as a community

liaison. Docket No. 29 at 4. In July 2011, Chip Munday was hired as general manager

of PLPOA. Docket No. 22-1 at 2, p. 7:18-23; Docket No. 20 at 1.

      PLPOA's Personnel Guidelines contain an "Anti-Discrimination / Anti-

_____

      [1]The following facts are undisputed unless otherwise indicated.

Harassment Policy" (the "policy").  Docket No. 21-1 at 4-6.  The policy defines and

provides examples of conduct that could constitute sexual harassment.  *Id.* at 5.  The

policy further states

> If an employee witnesses any prohibited harassment or discrimination, or
> believes he/she is being harassed or discriminated against, the individual
> should make a formal complaint, in writing, to the General Manager, to the
> Board of Directors, or to any member of the Board.  Employees are strongly
> encouraged to report harassment or discrimination promptly, before it
> becomes severe or pervasive.  The complaint should provide as much of the
> following information as possible under the circumstances: the date, time,
> and location of the incident; the name of the person alleged to have initiated
> the harassment and the name of the person subjected to the harassment; a
> factual description of the conduct; and the names of other persons
> witnessing the conduct.
>
> Allegations of harassment/discrimination will be investigated in as
> confidential a manner as is practical under the circumstances; however,
> absolute confidentiality cannot be guaranteed.  An individual who is found to
> have engaged in harassment/discrimination will be subject to appropriate
> disciplinary action, up to and including termination.  Retaliation against any
> individual who has registered a harassment/discrimination complaint or who
> has cooperated in connection with the investigation of such complaint will not
> be tolerated.

Docket No. 21-1 at 5-6.  On December 20, 2011, Ms. Murphy acknowledged that she

received and understood the Personnel Guidelines.  Docket No. 21-2.  It does not

appear that, prior to 2013, PLPOA provided anti-discrimination training to its

employees.  *See* Docket No. 20 at 7-8, ¶¶ 14-16; Docket No. 20-2 at 3, pp. 15:17-16:2;

Docket No. 22-9 at 2.

## A.  Incidents of Harassment

Ms. Murphy's complaint alleges that Mr. Munday sexually harassed her on five

occasions between January 2012 and December 2013, allegations which PLPOA

2

denies.[2]  Ms. Murphy's complaint alleges that, on or about January 23, 2012, Ms.

Murphy and PLPOA co-worker Tonya Hamilton met with Mr. Munday in his office, at

which point Mr. Munday stated to Ms. Murphy "Well you could just stay here and have a

drink with me" (the "January 23, 2012 incident").  Docket No. 1 at 3, ¶ 10.  In her written

statement, Ms. Hamilton alludes to hearing about this incident from Ms. Murphy, but

Ms. Hamilton does not indicate that she was present.  Docket No. 22-11 at 2.  However,

Ms. Murphy's complaint is not verified and her summary judgment briefs do not

specifically identify any evidence in support of the complaint's allegations regarding the

January 23, 2012 incident.

Ms. Murphy's complaint alleges that, on February 14, 2012, Mr. Munday acted

inappropriately towards her (the "February 14, 2012 incident").  Docket No. 1 at 3, ¶ 11.

Ms. Murphy went into Mr. Munday's office and asked Mr. Munday if she could have a

ribbon she saw on his desk to use for wrapping a present.  *Id.*  Ms. Murphy testified that

Mr. Munday "looked down at my crotch and said, 'Well, what kind of present,' and I said

'Not that,' and turned around and walked out and left the [ribbon] sitting there."  Docket

No. 24-1 at 5, p. 61:21-62:4; *see also* Docket No. 22-11 at 2.

Ms. Murphy's complaint alleges that Mr. Munday made inappropriate comments

during a September 2012 birthday celebration for Ms. Hamilton held at the PLPOA

offices (the "September 2012 incident").  Docket No. 1 at 3, ¶ 14.  In a written statement

to the PLPOA board, Ms. Hamilton stated that during a birthday celebration at the

---

[2]PLPOA asserts that Ms. Murphy's hostile work environment claim is based on five incidents.  Docket No. 21 at 4, ¶ 8.  Ms. Murphy does not dispute PLPOA's assertion or identify additional incidents of harassment.  Docket No. 23 at 4, ¶ 8.

PLPOA offices,

> We had a cheese cake with fruit on top.  In order to keep the fruit fresh and
> to keep it from browning, there is a clear gel that is applied over the top of it.
> Chip made some "implications" as to what it was, what it could be, but never
> really saying anything obvious.  Everybody knew what he was implying and
> many people nervously laughed because they didn't know what else to do.

Docket No. 20-11 at 2; *see also* Docket No. 1 at 3, ¶ 14.

Ms. Murphy's complaint alleges that, in November 2012, she was walking out of
a meeting when Mr. Munday said to her, "Those pants look good on you" (the
"November 2012 incident").  Docket No. 1 at 4, ¶ 16.  Ms. Murphy does not cite any
evidence in the record supporting this allegation.

Ms. Murphy's complaint alleges that, on December 21, 2012, Mr. Munday
behaved inappropriately towards her during the PLPOA Christmas party (the "Christmas
party incident").  Docket No. 1 at 4, ¶ 17.  Ms. Murphy and PLPOA homeowner Shelly
Johnson attended the PLPOA Christmas party.  Docket No. 22-11 at 1.  Ms. Murphy
testified that Mr. Munday "walked up to me, and I said, 'Merry Christmas,' and he bent
down, and he kissed me on the lips.  And I was just kind of shocked.  I was shocked."
Docket No. 20-1 at 3, p. 69:4-6.  Ms. Johnson did not witness Mr. Munday kissing Ms.
Murphy.  Docket No. 22-12 at 1.  Ms. Murphy and Ms. Johnson then sat down at a table
near Mr. Munday and his wife.  Docket No. 20-1 at 3, pp. 70:20-71:5.  PLPOA
employees Rick Starr and Russell "Jerry" Gallion later joined Ms. Murphy and Ms.
Johnson at their table.  *Id.* at 3, p. 72:7-10.  Mr. Munday came over to Ms. Murphy's and
Ms. Johnson's table and Ms. Murphy testified that Mr. Munday began rubbing on her
back and "then he started messing with my bra."  *Id.* at 3, p. 72:10-25; *see also* Docket
No. 22-11 at 1 ("I was wearing a red silk blouse.  He kept touching it and at one point

started rubbing the back of it and snapped my bra.").  Ms. Murphy looked at Ms.

Johnson, and Ms. Johnson looked up at Mr. Munday and asked, "What the hell are you

doing?"  *Id.*  According to Ms. Murphy and Ms. Johnson, Mr. Munday stepped back, put

his hands in the air, said "I got a little carried away with the silk," and eventually left the

table.  Docket No. 22-11 at 1; Docket No. 22-12 at 1.  Mr. Munday admits to hugging

Ms. Murphy at the Christmas party, but denies kissing her, rubbing her shoulders, or

tugging at her bra strap.  Docket No. 22-2 at 2, p. 59:2-23.

On December 26, 2012, Ms. Murphy sent Mr. Munday an email that stated "I

wanted to thank you for a fun Christmas party and the warm welcome...:)," to which Mr.

Munday responded "My pleasure – anytime! ☺"  Docket No. 24-4.  Ms. Murphy testified

that she sent the email because "I wanted to have something in writing that I could go to

– okay.  I wanted to have something in writing so I could go to him and say stop this or

I'm going to show this to somebody."  Docket No. 24-1 at 6, p. 96:8-17.

Ms. Murphy testified: "Q.  . . . Did you ever tell Chip Munday to knock it off or to

stop?  A.  No."  Docket No. 24-1 at 5, p. 61:7-9.  She later testified that, other than

telling Mr. Munday "Not that" during the February 14, 2012 incident, she could not recall

telling Mr. Munday to "knock it off or quit."  *Id.* at 5, pp. 61:21-62:13.

Ms. Murphy claims to have first reported Mr. Munday's behavior to PLPOA

Human Resources Director Donald Arries in February 2012, but it is unclear precisely

what she told Mr. Arries at that time.  Citing her own deposition testimony, Ms. Murphy

asserts that, on February 5, 2012, she told Mr. Arries that Mr. Munday was "sexually

harassing her."  Docket No. 20 at 4.  However, Ms. Murphy failed to attach the cited

portion of her deposition to her briefs and, as a result, her assertion is unsupported.

5

PLPOA cites a different portion of Ms. Murphy's deposition testimony, where Ms. Murphy testified that, on February 21, 2012, she told Mr. Arries that Mr. Munday was behaving inappropriately, but she did not recall whether she told Mr. Arries about any specific incidents.  Docket No. 22-3 at 5, pp. 46:25-48:22.  Ms. Murphy recalled telling Mr. Arries on that day that she did not wish to make a formal complaint.  *Id.*  Ms. Murphy testified that she spoke with Mr. Arries about Mr. Munday on other occasions, but could not recall when such conversations took place.  *Id.* at 6, p. 49:6-16.

On January 22, 2013, PLPOA front desk reception clerk Sue Passant complained to Mr. Munday about Ms. Murphy taking a long lunch hour.  Docket No. 22-3 at 7, p. 55:12-19.  Ms. Murphy testified that her immediate supervisor, Department of Community Standards manager Margaret Gallegos, "came in and told me that Mr. Munday was requiring that I contact Sue on an hourly basis so he would know where I was at all times."  *Id.*  After Ms. Gallegos told Ms. Murphy about Ms. Passant's complaint, Ms. Murphy told Ms. Gallegos that Mr. Munday had been acting inappropriately towards her.  *Id.* at 8, p. 57:13-22.  Ms. Gallegos urged Ms. Murphy to make a formal complaint to the board, but Ms. Murphy declined, explaining that doing so would make her uncomfortable.  *Id.* at 6, p. 52:12-16.  At approximately 4:30 p.m. that day, Ms. Gallegos contacted board president George Hatfield and told him about her conversation with Ms. Murphy (the "complaint").  Docket No. 22-5 at 1.  However, as Ms. Murphy testified, Ms. Gallegos did not contact Mr. Hatfield at Ms. Murphy's direction:

Q.  . . . Did you ask Margaret to forward your complaint to the board?

A.  No.

6

Q.  So Margaret took it upon herself to complain to the board in January 2013 about Chip Munday?

A.  She did it without me asking first to do it.

Q.  Did you know she was going to do it?

A.  No, not at that point.

Docket No. 22-3 at 6, pp. 51:24-52:8.

## B.  Investigation

Mr. Hatfield conducted the investigation into the complaint with assistance from other board members.  Docket No. 26-1 at 1, ¶ 2.  As part of the investigation, he prepared the PLPOA Personnel Complaint January 2013 [Docket No. 22-5] (the "investigation report"), which documents the steps that Mr. Hatfield and the board took in investigating the complaint.  *Id.* at 1, ¶ 3.  Mr. Hatfield states that he prepared the investigation report during the investigation by making entries shortly after interviews and other events occurred.  *Id.* at 1, ¶ 4.[3]

---

[3]Ms. Murphy objects to the admissibility of the investigation report on hearsay grounds.  *See* Docket No. 23 at 5-6, ¶¶ 14, 21.  It is unclear whether Ms. Murphy argues that the investigation report is inadmissible in its entirety or whether she argues that certain portions containing hearsay within hearsay are inadmissible.  However, Mr. Hatfield's declaration states that the report "reflects the investigation I conducted and my understanding of the interviews and evidence I received during that investigation."  Docket No. 26-1 at 1-2, ¶¶ 3-5.  The Court construes Mr. Hatfield's declaration as adopting the investigation report such that, if called as a witness, he would testify at trial to the events and conclusions contained in the investigation report.  Thus, to the extent the report recounts the steps that Mr. Hatfield took and the conclusions he reached in investigating the complaint, *see, e.g.*, Docket No. 22-5 at 1 ("The . . Directors and myself met at the PLPOA Administration building at the pre arranged time."), Mr. Hatfield could testify to such matters at trial and such evidence is therefore not hearsay.  *See S.E.C. v. Carnicle*, 216 F.3d 1088, at *1 (10th Cir. June 21, 2000) (unpublished) ("*Ex parte* affidavits or any other type of sworn testimony are always admissible for summary judgment purposes as long as the testimony is of a type that would be admissible if the swearing witness testified at a trial on the matter.").  To the extent the

On the evening of January 22, 2013, Mr. Hatfield contacted board members Tim Jennings, Rodney Profitt, and Kimberly Bradshaw and set a special board meeting regarding the complaint. Docket No. 22-5 at 1. That evening, Mr. Hatfield also contacted Ms. Murphy and asked her to provide the board with a written statement regarding the complaint, Docket No. 21 at 5, ¶ 18. Ms. Murphy does not identify any evidence to the contrary. Docket No. 23 at 5, ¶ 18.

On the morning of January 23, 2013, when the above-mentioned board members gathered to meet regarding the complaint, Mr. Hatfield testified that "no one had a prepared statement." Docket No. 22-1 at 6, p. 23:5-12. Mr. Hatfield testified that he told "everyone concerned" that they had to submit a prepared statement as soon as possible "because we were conducing interviews on it." *Id.* at 23:5-20. Ms. Murphy asserts that, although she requested more time, Mr. Hatfield gave her only ten minutes

_____

investigation report itself contains hearsay statements, *see, e.g.*, Docket No. 22-5 at 2 ("Don mentioned to me that Sue Passant (PLPOA Front Desk Reception Clerk) had complained to him about both Martha and Margaret not putting in their hours."), the Court considers such statements not for the truth of the matter asserted, but for their effect on Mr. Hatfield as the individual conducting the investigation. As a result, Ms. Murphy's hearsay objection is overruled.

Ms. Murphy asserts, without citation to the record, that "[t]here are no reports or results from any alleged investigation by PLPOA." Docket No. 20 at 6, ¶ 10. Ms. Murphy asserts that the investigation report was "created solely for litigation" and that Mr. Hatfield testified that two letters were the only documents prepared as a result of the investigation. *See* Docket No. 23 at 5-6, ¶ 21 (citing Docket No. 24-2 at 2, pp. 13:21-14:14). However, at his deposition, Mr. Hatfield was not asked whether the two letters were the only documents prepared as a result of the investigation and Ms. Murphy provides no support for her assertion that the investigation report was created solely for litigation. To the contrary, it appears that Mr. Hatfield was first asked about the investigation report on page 39 of his deposition, *see* Docket No. 24-2 at 1, but neither side provided that portion of Mr. Hatfield's deposition. Thus, plaintiff has identified no evidence that contradicts Mr. Hatfield's declaration.

that morning to prepare her written statement.  Docket No. 20 at 4, ¶ 7.[4]  Ms. Murphy

submitted a written statement to the board, which stated that Mr. Munday "would

regularly come into the office I shared with Tonya Hamilton and involve himself in our

conversations.  He would make rude suggestion[s] and tend to steer the conversation

towards a sexual connotation," but also that Ms. Murphy ignored such behavior and did

not react "other than to discuss my situation with co workers."  Docket No. 21-7 at 1.

The statement described the Christmas party incident, but did not identify any other

specific incidents.  It further stated: "This has been going on for about a year now.  I'm

not the only person who has witnessed his behavior.  I'm currently looking for new

employment because of the uncomfortable working conditions."  *Id.*

      At approximately 9:45 a.m. on January 23, 2013, Mr. Hatfield reached Mr.

Munday, who was on vacation at the time, and informed him of the complaint.  Docket

No. 22-5 at 1.  The board members Mr. Hatfield, Mr. Profitt, and Ms. Bradshaw met at

the PLPOA office and, at approximately 11:02 a.m., began interviewing Ms. Murphy

while Ms. Gallegos was in the room.  Docket No. 21 at 6, ¶ 22.[5]  According to the

---

[4]To the extent Ms. Murphy relies on plaintiff's Exhibit N [Docket No. 20-14] in support of this assertion, Ms. Murphy fails to establish that Exhibit N is proper summary judgment evidence.  Although Ms. Murphy testified to having written Exhibit N, there is no explanation as to why or when she wrote it.  Docket No. 21-3 at 7, pp. 62:14-64:23.  Moreover, Exhibit N does not bear Ms. Murphy's name or signature and she has not endorsed its accuracy.  *See generally* Docket No. 20-14.  As a result, Ms. Murphy has failed to establish that it is appropriate for the Court to consider Exhibit N.  *See Howell v. N.M. Dep't of Aging & Long Term Servs.*, 398 F. App'x 355, 359 (10th Cir. 2010) (unpublished) ("that document is not in the form of an affidavit or an unsworn declaration and was not within the range of evidence that the district court could consider on summary judgment") (citation and quotations omitted)).

[5]Ms. Murphy asserts that, during her interview, "Steve Milton was calling, texting and emailing the perpetrator Munday."  Docket No. 20 at 4 (citing Docket No. 20-14 at

investigation report, Ms. Murphy appears to have discussed her written statement, expressed that she felt uncomfortable because Mr. Munday had been keeping tabs on her whereabouts, and, when asked what she thought Mr. Munday intended by his actions, responded that he "wanted sex." Docket No. 22-5 at 1. At 11:14 a.m., the board excused Ms. Murphy and continued to discuss the complaint with Ms. Gallegos. Docket No. 22-5 at 1.

At Mr. Hatfield's request, Ms. Hamilton submitted a written statement. *Id.*; *see also* Docket No. 22-11 at 2-3. According to her written statement, when Mr. Munday was in the office that Ms. Hamilton and Ms. Murphy shared, he would "usually take[] something we say out of context and turn[] it into something with sexual overtures," but Ms. Hamilton could not recall a specific example "because these types of things just don't bother me." Docket No. 22-11 at 2-3. Ms. Hamilton's written statement recalled the September 2012 incident and that Ms. Murphy had confided in her at various times regarding Mr. Munday's behavior. *Id.* After reading her written statement, the board interviewed Ms. Hamilton while Ms. Gallegos was present; Ms. Hamilton confirmed that Ms. Murphy confided in her regarding incidents concerning Mr. Munday. Docket No. 22-5 at 1. At 12:10 p.m., both Ms. Hamilton and Ms. Gallegos were excused. *Id.* at 2. The board decided to speak with the PLPOA's attorney and that it would hold a special board meeting on January 28, 2013. *Id.* Later that day, Mr. Hatfield spoke with the PLPOA's attorney. *Id.* Mr. Hatfield also spoke with Mr. Munday, who denied

---

5). PLPOA argues that Ms. Murphy's support for this assertion is inadmissible hearsay and speculation. Docket No. 22 at 4, ¶ 7. The Court agrees with PLPOA that the cited evidence lacks foundation and, for the reasons discussed above, cannot be considered.

purposefully making sexual advances and expressed his belief that Ms. Murphy's time card contained some irregularities.  *Id.*

On January 24, 2013, Mr. Hatfield met with Mr. Arries and the two discussed Ms. Murphy's time cards.  *Id.*  Mr. Hatfield requested Ms. Murphy's timesheets from December 1, 2012 forward and noted that the sheets from December 4 through December 14 contained some unusual entries.  *Id.*

On Friday, January 25, 2013, Ms. Hamilton asked to meet with Mr. Hatfield privately.  *Id.*  On Saturday, January 26, 2013, Ms. Hamilton and Mr. Hatfield met at Mr. Hatfield's home.  *Id.*  Ms. Hamilton told Mr. Hatfield that Ms. Murphy and Ms. Gallegos had been turning in false time sheets and that Ms. Murphy was working fewer hours than claimed on her time sheets and using the PLPOA car for personal errands.  *Id.*  Ms. Hamilton told Mr. Hatfield that it was Ms. Gallegos who urged Ms. Murphy to complain about the Christmas party incident.  *Id.*

On Sunday, January 27, 2013, Mr. Hatfield spoke with Ms. Passant by phone, who notified Mr. Hatfield that she had observed Ms. Murphy keeping irregular work hours.  *Id.* at 3.  Mr. Hatfield asked Ms. Passant if she had witnessed any type of sexual harassment from Mr. Munday and she replied that she had not observed anything that could be considered inappropriate.  *Id.*  Ms. Passant appears to have submitted a written statement to that effect to the board.  *See* Docket No. 22-11 at 4.

On Monday, January 28, 2013 at 8:30 a.m., board members Mr. Hatfield, Mr. Profitt, Ms. Bradshaw, Roger Scott, and BJ Jones met at the PLPOA administration building and, at 9:00 p.m., were joined by Mr. Jennings.  Docket No. 22-5 at 3.  The

board went into an executive session, where the board members were briefed on this investigation. *Id.* The board decided to interview Mr. Starr and Mr. Gallion because both men sat at Ms. Murphy's table during the Christmas party. *Id.* Later that day, the board met with Mr. Starr who stated that, at the Christmas party, he saw Mr. Munday kiss Ms. Murphy beside the fireplace and rub her back when she was at the bar. *Id.* The board also met with Mr. Gallion, who told the board that he did not witness any inappropriate actions while he was attending the Christmas party. *Id.* Mr. Gallion submitted a written statement to that effect. Docket No. 22-11 at 5.

After meeting with PLPOA attorneys, the board decided to request a written statement from Ms. Gallegos and an additional written statement from Ms. Murphy, although it is not clear whether Ms. Murphy was informed of this request because Monday, January 28 was Ms. Murphy's day off. Docket No. 22-5 at 4. Later that day Mr. Hatfield received an email from Mr. Munday. Docket No. 22-11 at 7-8. Mr. Munday's email stated that he had instituted operational changes within the Department of Community Standards and received complaints regarding Ms. Murphy's irregular work schedule, including one day where Ms. Murphy took an extended lunch, which Mr. Munday later learned was to deal with a family emergency. *Id.* at 7. Mr. Munday denied engaging in any inappropriate conduct towards Ms. Murphy at the Christmas party or at any other time while at PLPOA. *Id.* at 7-8. Mr. Munday stated that he would not accept any discipline from the board with respect to the complaint. *Id.* at 8. Mr. Hatfield shared Mr. Munday's email with the board. Docket No. 22-5 at 4.

On January 30, 2013, Ms. Gallegos provided the board with a written statement,

recommending that the PLPOA maintain a harassment free workplace, institute an annual harassment training program for managers, staff, and board members, create an environment where employees feel free to raise harassment-related concerns, and establish a zero tolerance for retaliation.  *Id.*  Ms. Gallegos declined to issue a recommendation regarding whether Mr. Munday should be disciplined.  Docket No. 21 at 8, ¶ 30; Docket No. 22-10 at 1.   After speaking with Ms. Gallegos, Mr. Hatfield learned that Ms. Murphy called in sick the previous day and had requested that Ms. Gallegos approve additional time off to deal with stress.  Docket No. 22-5 at 4.[6]  Mr. Hatfield spoke again with Mr. Arries, who told Mr. Hatfield that Ms. Murphy had not previously reported inappropriate behavior.  *Id.*

On February 1, 2013, the board received a written statement from Mr. Starr.  *Id.* at 4; *see also* Docket No. 22-11 at 6.  Mr. Hatfield interpreted Mr. Starr's written statement as indicating that Mr. Starr had not personally witnessed any inappropriate behavior, but rather that Ms. Murphy merely told Mr. Starr what happened.  Docket No. 22-5 at 4.  Mr. Hatfield concluded that Mr. Starr's written statement was inconsistent with what he had told the board in person.  *Id.* at 4-5.[7]  Over the next two days, Mr. Hatfield updated board members on the investigation, and the board agreed to hold an

---

[6]It appears that Ms. Murphy did not return to work at PLPOA, but continued to take sick time and vacation time until February 14, 2013, at which time she informed PLPOA that she had been constructively discharged.  *See* Docket No. 21-10.

[7]Although Ms. Murphy appears to assert that Mr. Hatfield's interpretation of Mr. Starr's written statement was incorrect, she does not identify any evidence suggesting that her interpretation is the only reasonable one or that Mr. Hatfield did not genuinely believe Mr. Starr's written statement was inconsistent with his verbal statements to the board.  *See* Docket No. 23 at 7, ¶ 31.

executive session on Monday, February 3, 2013.  *Id.* at 5.

On February 3, 2013, the board met and discussed the complaint.  *Id.* at 5.  Four board members voted in favor of and two board members voted against "unfounding" the complaint.  *Id.*  Mr. Profitt volunteered to draft a letter of caution to Mr. Munday as well as a letter with the board's findings to Ms. Murphy.  *Id.*  The board determined that, in the future, Mr. Arries would handle any irregularities with respect to Ms. Murphy's time sheets.  *Id.*

On February 8, 2013, Mr. Hatfield sent a letter to Ms. Murphy on behalf of the board.  Docket No. 22-10.  The letter stated, in part:

> By consensus, the board determined that events occurred, which may have been questionable.  Further, also by consensus, the board determined that certain employees perceived these events in different ways that clouded specifics.  Finally, by consensus, the board determined that other motives were at work that may have prompted this complaint.  Without sufficient evidence verifying the complaint, the board will not take any disciplinary action.
>
> *     *     *
>
> The board values your service to PLPOA.  It has come to our attention you are taking a great deal of time off since this complaint was made – maxing out both sick leave time and vacation time.  The board is concerned about this, and encourages you to return to work and a normal routine.  If you need additional support, please talk to your supervisor.  Mr. Munday will no longer be handling personnel issues; those matters will now be the responsibility of Mr. Arries, and you may contact him as well if there are other issues to address.

*Id.* at 1-2.  Ms. Murphy denies any allegations that she falsified time sheets or engaged in any improprieties with respect to her work schedule.  Docket No. 23 at 6, ¶¶ 27-28.

The same day, Mr. Hatfield sent Mr. Munday a letter on behalf of the board.  Docket No. 22-9 at 1.  The board's letter to Mr. Munday contained a paragraph

14

recounting the board's findings that was very similar to the paragraph contained in the board's letter to Ms. Murphy, except that, in the letter to Mr. Munday, the phrase "which may have been questionable" was deleted.  *Compare id.*, *with* Docket No. 22-10 at 1. Ms. Murphy asserts that Mr. Hatfield intentionally deleted the phrase "which may have been questionable" from the letter to Mr. Munday, but does not cite any evidence in support of such an assertion.  Docket No. 20 at 2-3, ¶ 2.  PLPOA denies that the omission was intentional.  Docket No. 22 at 3, ¶ 2.  The board's letter to Mr. Munday also directed that review of employee time sheets and disciplinary matters be handled by Mr. Arries, that all employees participate in diversity training, that all personnel policies be reviewed, and that staff review whether there is sufficient accountability of employee time on the job.  Docket No. 22-9 at 2.  The board expressed displeasure with the tenor of Mr. Munday's email and stated that "[w]e sincerely hope the frustrations expressed in your statement do not translate into action upon your return" and "expect[] professional restraint and normalcy in going forward."  *Id.*  On March 11, 2013, Mr. Munday completed the PLPOA eLearning course Preventing Harassment 2013-2014 for Managers 2-hour.  Docket No. 22-6.

On February 8, 2013, Ms. Murphy advised Ms. Gallegos that she had retained an attorney.  Docket No. 21-10.[8]  On February 13, 2013, Mr. Arries emailed Ms. Murphy advising her that, pursuant to the employee guidelines, employees who fail to report for work for two consecutive working days are considered to have voluntarily resigned.  *Id.* On February 14, 2013, Ms. Murphy replied, stating "I don't resign.  My case is

---

[8]It is unclear whether Ms. Murphy had received the board's letter at the time she emailed Ms. Gallegos.

considered constructive discharge per my attorney" and directed that future contact be made through plaintiff's counsel.  *Id.*

### C.  Procedural History

On December 20, 2013, Ms. Murphy filed this case.  Docket No. 1.  Ms. Murphy brings claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, for hostile work environment and retaliation on the basis of gender.  *Id.* at 8-9.[9]  On October 23, 2014, Ms. Murphy filed a motion for summary judgment, seeking summary judgment in her favor "as to all of the elements of her claims."  Docket No. 20 at 14.  On October 27, 2014, PLPOA filed a motion for summary judgment, seeking summary judgment in its favor on all of Ms. Murphy's claims.  Docket No. 21 at 1.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a

---

[9]Ms. Murphy's complaint also alleges that PLPOA subjected her to "disparate treatment," *Id.* at 8, ¶ 40, but Ms. Murphy does not appear to pursue her discrimination claim under such a disparate treatment theory.

verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

However, "[w]hen, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998)) (internal quotation marks omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman,* 252 F.3d at 1115 (citing *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir.1994)).  "In applying this standard, we view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party." *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

### III.  ANALYSIS

### A.  Hostile Work Environment

Sexual harassment that is sufficiently serious qualifies as unlawful sex

discrimination under Title VII.  *Meritor Savs. Bank v. Vinson*, 477 U.S. 57, 67 (1986).

Ms. Murphy can establish a claim of a hostile work environment based on unlawful sex

discrimination by showing (1) that she was discriminated against because of her sex,

and (2) that the discrimination was sufficiently severe or pervasive so as to alter her

conditions of employment.  *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir.

2012).  To establish a hostile work environment claim, Ms. Murphy must show that the

environment was both "objectively and subjectively hostile or abusive."  *Id*. (citation

omitted).  Ms. Murphy must also show that defendant is liable for any unlawful incidents

of sexual harassment.  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998);

*Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).[10]

#### 1.  Severe or Pervasive

To establish that her workplace was hostile, Ms. Murphy must provide evidence

showing that the workplace was "permeated with discriminatory intimidation, ridicule,

and insult, that [was] sufficiently severe or pervasive to alter the conditions of [her]

employment and create an abusive working environment."  *Herrera v. Lufkin Indus.,*

*Inc.*, 474 F.3d 675, 680 (10th Cir. 2007).  Severity and pervasiveness, while

independent and equal grounds, are inversely related to a certain degree; "'a sufficiently

---

[10]For purposes of resolving this motion, the Court assumes, without deciding, that the claimed harassment was gender-based.  *See Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (holding that plaintiff must prove harassment was because of gender).

severe episode may occur as rarely as once . . . , while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute.'" *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008) (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002)).  Severity and pervasiveness are evaluated according to the totality of the circumstances, considering such factors as "the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007) (listing factors to be considered in determining whether environment is hostile or abusive).

As a threshold matter, Ms. Murphy does not, as it is her burden to do, identify those incidents of harassment that make up her hostile work environment claim.  Ms. Murphy's motion references only the September 2012 and Christmas party incidents.  *See* Docket No. 20 at 3-4, ¶ 4; *id.* at 6, ¶ 11.  Ms. Murphy's response to PLPOA's motion for summary judgment sheds no additional light on this question.  *See generally* Docket No. 23.  Although Ms. Murphy is silent in response to PLPOA's assertion that her hostile work environment claim consists of the five incidents identified in her complaint, *see* Docket No. 21 at 4, ¶ 8; Docket No. 23 at 4, ¶ 8, it would be a stretch to construe her silence as affirmatively setting forth a legal theory.  Moreover, as discussed above, Ms. Murphy identifies specific evidence in support of the September 2012 and Christmas party incidents, but does not do so with respect to the January 23, 2012, February 14, 2012, and November 2012 incidents.  Her failure to do so may

19

indicate that she no longer bases her claim on those three incidents.  Regardless of

what Ms. Murphy's intention may be with respect to the alleged incidents of

harassment, the allegations in Ms. Murphy's unverified complaint are insufficient to

defeat a motion for summary judgment, *see Celotex*, 477 U.S. at 324, as to those

incidents she fails to support by "reference to affidavits, deposition transcripts, or

specific exhibits."  *See Adler*, 144 F.3d at 671.

The Court therefore turns to the question of whether the September 2012 and

Christmas party incidents – the only incidents that Ms. Murphy has properly supported

by citation to the record – are sufficiently severe or pervasive to establish a hostile work

environment claim.  PLPOA argues that no single incident, by itself, rises to the level of

severity required to create a hostile work environment and that the incidents, when

considered together, are not sufficiently pervasive.  *Id.* at 11-12.  PLPOA contends that

insufficient evidence exists upon which to conclude that Ms. Murphy subjectively

perceived her work environment to be abusive.  *Id.* at 13.  Ms. Murphy offers no

meaningful response to PLPOA's arguments on this issue.  Ms. Murphy's response

brief to PLPOA's motion for summary judgment argues, without citation to the record,

that "Murphy has proven that the conduct from Munday was unwelcome, offensive,

directed at Murphy because of her gender, the conduct was sufficiently severe or

pervasive to alter the conditions of her employment by creating a hostile work

environment."  Docket No. 23 at 9.  Ms. Murphy's motion for summary judgment argues,

"There are no material facts in dispute.  Murphy was sexually harassed by Munday."

Docket No. 20 at 14.  Such arguments are conclusory and, more importantly, fail to

identify specific facts to create a genuine issue for trial.  It is not incumbent upon the

Court to parse the record for evidence supporting Ms. Murphy's claims or to articulate a legal theory on her behalf.

The Court is otherwise satisfied that PLPOA is entitled to summary judgment on this issue.  The September 2012 and Christmas party incidents are not, by themselves, sufficiently severe so as to alter the conditions of Ms. Murphy's employment.  The evidence Ms. Murphy identifies in support of the September 2012 incident suggests only that Mr. Munday made tasteless "implications," Docket No. 22-11 at 2, but Ms. Murphy does not otherwise provide sufficient detail or context regarding the September 2012 incident so as to conclude that it rises to the level of actionable conduct or identify evidence establishing that she was even present during the incident.  *See Bertsch v. Overstock.com*, 684 F.3d 1023, 1028 (10th Cir. 2012) ("A line must be drawn between actionable conduct and conduct that is merely insensitive, tasteless, or vulgar.  Title VII's mandate is not to ensure workplace harmony or create a finishing school."). Although there is evidence that the Christmas party incident understandably caused Ms. Murphy to be upset, the incident is not, by itself, sufficiently severe so as to create an objectively hostile work environment.  *Cf. Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998) ("A rational jury could find that . . . regular unwelcome hugging and kissing combined with . . . an assault . . . is objectively hostile."); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997) (concluding that incident where co-worker "put his arm around me and I caught him looking down my dress" was insufficient to establish a hostile work environment).  Ms. Murphy does not meaningfully argue otherwise.

Neither are the September 2012 and Christmas party incidents, when considered

together, sufficiently pervasive so as to create an objectively abusive environment. Moreover, the September 2012 and Christmas party incidents fall short of the "steady barrage" of actionable behavior that constitute actionable harassment. *Chavez*, 397 F.3d at 832; *Morris v. City of Colo. Springs*, 666 F.3d 654, 666 (10th Cir. 2012) (isolated comments and touchings generally do not constitute actionable harassment); *cf. Sprague*, 129 F.3d at 1366 (concluding that five separate incidents spread over a span of 16 months were insufficient to establish existence of abusive work environment).

In the absence of argument or the identification of specific facts to the contrary, the Court finds that Ms. Murphy has failed to create a genuine issue for trial as to the severity and pervasiveness of Mr. Munday's alleged conduct.[11]

### 2. *Defendant's Liability for Acts of Supervisor*

Even assuming a reasonable juror could find that Ms. Murphy has sufficiently established a prima facie case of sexual harassment, Ms. Murphy's claims fail on the issue of liability. The Supreme Court has ruled that employers are not automatically liable for sexual harassment perpetrated by their employees. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807. The Court, however, held that employers may be liable for the conduct of their employees under two theories: (1) negligence and (2) vicarious liability. *Helm v. Kan.*, 656 F.3d 1277, 1285 (10th Cir. 2011). Under the negligence theory, "'an employer is directly liable for an employee's unlawful harassment if the employer was negligent with respect to the offensive behavior.'" *Kramer v. Wasatch*

---

[11]Even assuming that Ms. Murphy sufficiently identified and supported the five incidents of harassment alleged in her complaint, Ms. Murphy does not meaningfully contradict PLPOA's argument that such incidents are insufficiently severe or pervasive so as to establish a hostile work environment claim. Docket No. 21 at 11-13.

*Cnty. Sheriff's Office*, 743 F.3d 726, 737 (10th Cir. 2014) (quoting *Vance v. Ball State Univ.*, --- U.S. ----, 133 S. Ct. 2434, 2441 (2013)). If, however, the harasser is a supervisor within the meaning of Title VII, *see Vance*, 133 S. Ct. at 2443, "the employer may be vicariously liable for the conduct, depending on the circumstances." *Id.* When a supervisor's harassment "culminates in a 'tangible employment action,' the employer is strictly liable for sex discrimination, with no defense." *Id.* When a supervisor's harassment does not culminate in a tangible employment action, the employer is shielded from vicarious liability if the employer can prove the two prongs of what is known as the *Faragher/Ellerth* defense. *Ellerth*, 524 U.S. at 765; *Helm,* 656 F.3d at 1285. Here, the parties do not dispute that Mr. Munday was Ms. Murphy's supervisor within the meaning of Title VII.

### a. Tangible Employment Action

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 762. A tangible employment action will, in most cases, inflict direct economic harm, *id.*, but economic harm is not necessary in every case. *Kramer*, 743 F.3d at 738. "However, neither 'a bruised ego' nor a demotion *without* a concurring change in pay, benefits, duties, or prestige is enough." *Id.* at 739 (emphasis in original). In addition, "[a] tangible employment decision requires an official act of the enterprise, a company act." *Ellerth*, 524 U.S. at 762. In the Tenth Circuit, one test to illustrate whether a given harm is a tangible employment action "is to ask whether a co-worker could have

23

inflicted the same harm as easily.  If the answer is yes, then the harm is not a tangible employment action."  *Kramer*, 743 F.3d at 739; *see also Ellerth*, 524 U.S. at 762 ("A co-worker can break a co-worker's arm as easily as a supervisor, and anyone who has regular contact with an employee can inflict psychological injuries by his or her offensive conduct.").

PLPOA argues that Ms. Murphy suffered "no tangible employment action because the board in no way changed the status, terms or conditions of Murphy's employment" and that, to the contrary, the board "encouraged her to return to work with assurances that the workplace would be 'comfortable.'"  Docket No. 21 at 14.  Ms. Murphy does not directly respond to PLPOA's argument or identify any evidence that a tangible employment action, in the traditional sense, took place.  Moreover, no such evidence is apparent to the Court.

Ms. Murphy's briefs, generously construed, could be interpreted as asserting that her constructive discharge was a tangible employment action.  *See, e.g.*, Docket No. 23 at 12 ("Murphy was constructively discharged from Defendant because the Defendant refused to properly investigate the claims and reprimand Munday.").  The Supreme Court has recognized that the *Faragher/Ellerth* defense may not be available to an employer "if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions."  *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004.  However, in such a case the plaintiff must establish "working conditions so

intolerable that a reasonable person would have felt compelled to resign." *Id.* at 147.[12]
Ms. Murphy makes no such showing. *Cf. Chapman v. Carmike Cinemas*, 307 F. App'x
164, 169 (10th Cir. 2009) (unpublished) (holding that, because plaintiff attributed
constructive discharge to her psychological state, rather than to an official act of the
employer, employer could not invoke *Ellerth/Faragher* defense); *see also E.E.O.C. v.
PVNF, L.L.C.*, 487 F.3d 790, 806 (10th Cir. 2007) ("in constructive discharge cases the
question is not whether the employee's resignation resulted from the employer's
actions, but whether the employee had any other reasonable choice to resign in light of
those actions" (quotations omitted)).  Ms. Murphy presents no evidence or argument
that, despite the remedial measures adopted by the board as a result of the
investigation, a reasonable person in her position would have felt compelled to resign.
Because Ms. Murphy has failed to show that the claimed harassment culminated in a
tangible employment action, PLPOA is entitled to assert the *Faragher/Ellerth* defense.

### b.  Defendant's *Faragher/Ellerth* Defense

To establish the *Faragher/Ellerth* defense, an employer must come forward with
evidence: (1) that it exercised reasonable care to prevent and promptly correct any
sexually harassing behavior, and (2) that the plaintiff employee unreasonably failed to
take advantage of any preventive or corrective opportunities provided by the employer.
*Faragher*, 524 U.S. at 807.

---

[12]It is unclear why Ms. Murphy cites Colorado law in support of her constructive
discharge argument.  Docket No. 23 at 13 ("Colorado recognizes the doctrine of
constructive discharge." (citing Colorado law)).  Although there appears to be little
difference between Colorado and federal constructive discharge law, it is federal
constructive discharge law that applies to Ms. Murphy's Title VII claims.  *See Suders*,
542 U.S. at 134.

The first element of the *Faragher/Ellerth* defense requires that an employer exercise reasonable care to prevent sexual harassment and correct promptly any sexual harassment that has occurred.  *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1062 (10th Cir. 2009).  As to prevention, the Tenth Circuit has held that an employer can satisfy the prevention requirement by showing the existence and dissemination of a valid sexual harassment policy.  *Helm*, 656 F.3d at 1288.  Here, it is undisputed that PLPOA has a sexual harassment policy and disseminated it to Ms. Murphy.  Docket No. 21 at 3, ¶¶ 1-2; Docket No. 23 at 10.  Although Ms. Murphy suggests that PLPOA should have earlier instituted anti-discrimination training, Docket No. 20 at 11, where an employer has a valid, disseminated sexual harassment policy, it is not clear that anti-discrimination training is required.  *See Helm*, 656 F.3d at 1289 ("Numerous courts have held that employers acted reasonably as a matter of law when they adopted valid sexual harassment policies, distributed those policies to employees via employee handbooks, and either provided no sexual harassment training or provided training only to managers.").  In the absence of argument to the contrary, the Court finds that PLPOA has a facially effective anti-harassment policy sufficient to satisfy the prevention requirement.

The Tenth Circuit has held that an employer can establish the correction requirement by showing that it acted promptly to investigate or address a complaint of harassment.  *Helm*, 656 F.3d at 1290.  The "most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified."  *Id*. (citing *Swenson v.*

*Potter*, 271 F.3d 1184, 1192 (9th Cir. 2001)).   Here, it is undisputed that Mr. Hatfield

began an investigation on January 22, 2013, the same day he received the complaint,

that the investigation concluded on February 3, 2013, and that Ms. Murphy was notified

of the results on February 8, 2013.   Docket No. 22-5 at 1, 5; Docket No. 22-10.   Mr.

Hatfield requested and received witness statements from multiple PLPOA employees

and interviewed (a) both PLPOA employees who worked directly with Ms. Murphy and

Mr. Munday and (b) PLPOA employees who sat at Ms. Murphy's table during the

Christmas party.   *See generally* Docket No. 22-5.   Although the board voted in favor of

"unfounding" Ms. Murphy's complaint and decided not to discipline Mr. Munday, the

board put multiple measures in place, not the least of which was transferring

responsibility for personnel investigations from Mr. Munday to Mr. Arries, to minimize

contact between Ms. Murphy and Mr. Munday, and instituting mandatory "diversity"

training for all employees.   Docket 22-9 at 2.   There is no evidence in the record that,

after these measures were instituted, Mr. Munday engaged in any harassing behavior

or that such measures would not have been effective in preventing incidents similar to

what Ms. Murphy complained of.

Ms. Murphy principally argues that PLPOA has not satisfied the correction

requirement because Mr. Hatfield inserted his personal opinions into the investigation

and should have used an independent investigator.   Docket No. 23 at 10-11.   However,

the mere fact that Ms. Murphy disagrees with the investigation's conclusion does not,

by itself, render the investigation unreasonable.   Moreover, there is no evidence that

Ms. Murphy ever requested that PLPOA enlist a third party to investigate the complaint

or that, absent such a request, PLPOA was required to do so.[13]

Ms. Murphy argues that the investigation was flawed because, on the morning of January 23, 2013, she was given only ten minutes to write a statement regarding the complaint.  Docket No. 20 at 12; Docket No. 23 at 11.  However, Ms. Murphy does not dispute that, on the evening of January 22, 2013, Mr. Hatfield contacted Ms. Murphy and asked her to provide a written statement.  Docket No. 21 at 5, ¶ 18.  Moreover, Ms. Murphy does not indicate what, if any, additional information she would have included in her written statement if given more time or explain why she was unable to provide whatever information she did not have time to add to her written statement to the board during her interview or at a later time.

Ms. Murphy suggests that the PLPOA investigation was ineffective because Mr. Hatfield did not interview Ms. Johnson.  Docket No. 20 at 11.  However, Ms. Murphy does not explain, and it is not apparent, how Mr. Hatfield interviewing Ms. Johnson would have led to different remedial actions by the board.

PLPOA has established that it acted promptly to correct Mr. Munday's alleged behavior.  Ms. Murphy's arguments to the contrary are unsupported by citation to the record and otherwise without merit.  And there is no evidence suggesting that, after the investigation concluded, Mr. Munday continued to engage in inappropriate behavior towards Ms. Murphy.  PLPOA has therefore established the first element of the

---

[13]To the extent Ms. Murphy argues that PLPOA should have initiated an investigation based upon her February 2012 conversation with Mr. Arries, there is no evidence that Ms. Murphy provided Mr. Arries with sufficient information so as to trigger PLPOA's duty to correct Mr. Munday's behavior. *Cf. Helm*, 656 F.3d at 1290 ("Helm provided absolutely no details about Judge Stewart's conduct, nor does the record suggest that Helm even mentioned sexual harassment.").

*Faragher/Ellerth* defense.  *Cf. Helm*, 656 F.3d at 1291.

The second element of the *Faragher/Ellerth* defense requires the employer to demonstrate that the employee unreasonably failed to take advantage of its preventative or corrective policies.  *Helm*, 656 F.3d at 1291.  Although generally this element is satisfied based upon an employer's showing that the employee unreasonably failed to use an employer's complaint procedure, an employer is not so limited in proving that "an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm."  *Faragher*, 524 U.S. at 807-08.  Here, PLPOA argues that, because it is undisputed that Ms. Murphy did not return to work, she failed to avail herself of whatever corrective benefits the investigation would have provided her. Docket No. 21 at 16.  Ms. Murphy provides no argument to the contrary and, as discussed above, her assertion of constructive discharge is unsupported.  As a result, the Court concludes that PLPOA has satisfied its burden of establishing that Ms. Murphy unreasonably failed to take advantage of any corrective opportunities provided by PLPOA to avoid harm.  *See Faragher*, 524 U.S. at 807.  PLPOA has therefore established the *Faragher/Ellerth* defense.

For the foregoing reasons, PLPOA's motion for summary judgment on Ms. Murphy's hostile work environment claim is granted.

### B.  Retaliation

PLPOA argues that Ms. Murphy fails to identify sufficient evidence upon which to establish a Title VII retaliation claim.  Docket No. 21 at 16-17.  Title VII prohibits retaliation against individuals who oppose discriminatory employment practices in

complaints or investigations of employment practices prohibited by Title VII.  *See* 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation, a plaintiff must prove three elements: "(1) protected employee action; (2) adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and the employer's adverse action."  *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1264-65 (10th Cir. 2007).

As an initial matter, Ms. Murphy's briefs fail to meaningfully address these elements and, as a result, it is not clear what, if any, retaliation Ms. Murphy claims to have suffered.  "A challenged employment action is adverse for the purposes of a claim for retaliation under Title VII if a reasonable employee would have found it materially adverse," *McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006) (quotations omitted), such that the action "would likely have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 60 (2006) (quotations omitted).  Ms. Murphy does not claim that PLPOA terminated her employment and there is no evidence that Ms. Murphy "wanted to keep working [at PLPOA]."  *Cf. McInerney v. United Air Lines, Inc.*, 463 F. App'x 709, 716 (10th Cir. 2011) (unpublished).  Rather, Ms. Murphy argues that she was constructively discharged.  Docket No. 23 at 13.  A plaintiff may "satisfy the adverse employment action requirement by demonstrating that [s]he was constructively discharged."  *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 980 (10th Cir. 2008).  However, as discussed above, plaintiff fails to identify sufficient evidence upon which a reasonable juror could conclude that "a reasonable person in [Ms. Murphy's] position

30

would feel forced to resign." *See id.* (quotations omitted). Thus, Ms. Murphy fails to establish that she suffered an adverse employment action.

Ms. Murphy contends that "in response to Murphy's complaint, defendant retaliated against Murphy by claiming that she was falsifying her time." Docket No. 23 at 13. In support of her argument, Ms. Murphy cites Mr. Hatfield's deposition testimony, where he states that he first learned of allegations that Ms. Murphy was falsifying her time "when I was interviewing Tonya Hamilton." Docket No. 22-1 at 5, p. 18:5-11. However, Ms. Murphy's own deposition testimony contradicts her argument. Ms. Murphy testified that concerns regarding her time-related improprieties were raised before her complaint about Mr. Munday's behavior. Docket No. 22-3 at 7-8, pp. 56:23-57:25. As a result, Mr. Hatfield's investigation into allegations that Ms. Murphy was falsifying her time sheets cannot be reasonably construed as retaliation.

Ms. Murphy argues that an employer's "<u>failure</u> to investigate an internal complaint of discrimination may constitute retaliation." Docket No. 23 at 11. In support of her argument, Ms. Murphy cites *McInerney*, 463 F. App'x at 716. However, unlike the present case, in *McInerney*, the Tenth Circuit found sufficient evidence upon which to conclude that Ms. McInerney suffered an adverse employment action. *Id.* Having concluded that Ms. McInerney satisfied the first and second elements of her prima facie case, the Tenth Circuit concluded that the defendant's complete failure to investigate Ms. McInerney's discrimination complaint could give rise to an inference of a retaliatory motive with respect to the third element of the prima facie case. *Id.* at 718. Here, any deficiencies Ms. Murphy may have identified in PLPOA's investigation of the complaint do not rise to the level of establishing that PLPOA entirely failed to investigate the

complaint.  *Cf. id.*  As a result, Ms. Murphy's reliance on *McInerney* is unavailing.

Because Ms. Murphy fails to identify sufficient evidence to establish a prima

facie case of retaliation, PLPOA is entitled to summary judgment on Ms. Murphy's

retaliation claim.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Ms. Murphy's Motion for Summary Judgment as to Liability

[Docket No. 20] is **DENIED**.  It is further

**ORDERED** that PLPOA's Motion for Summary Judgment [Docket No. 21] is

**GRANTED**.  It is further

**ORDERED** that this case is dismissed in its entirety.


DATED April 20, 2015.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge